# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **BRIAN J. MACNEIL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:12cv1756 AGF** |
| | ) | **TCM** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Brian MacNeil for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b.

Mr. MacNeil has filed a brief in support of his complaint; the Commissioner has filed a brief in support of her answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Brian MacNeil (Plaintiff) applied for SSI in June 2007, alleging he is and has been disabled since birth by attention deficit hyperactivity disorder (ADHD), static encephalopathy,[1] mild mental retardation, and palsy.[2] (R.[3] at 244-46, 277.) His application

---

[1]Encephalopathy is "[a]ny disease of the brain." Stedman's Medical Dictionary, 566 (26th ed. 1995). Static encephalopathy is permanent brain damage. See Encephalopathy,

was denied initially and following a hearing held in September 2009 before Administrative Law Judge (ALJ) Robert E. Ritter. (Id. at 82-131, 145-49.) The Appeals Council first denied Plaintiff's request for review, then vacated its denial and remanded to the ALJ for further consideration of the question whether Plaintiff's work was substantial gainful activity. (Id. at 139-42.) After another hearing, held in July 2011, the ALJ issued an adverse supplemental decision. (Id. at 8-15, 23-81.) The Appeals Council denied Plaintiff's subsequent request for review, effectively adopting the ALJ's second decision as the final decision of the Commissioner. (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and James E. Israel, L.P.C., C.V.E., C.R.C.,[4] testified at the first administrative hearing.

Plaintiff testified that he is currently working as a janitor at the Records Center, and has been working there for one year. (Id. at 87, 94.) His stepfather works there also and had helped him fill out the application; a job coach had helped him learn the job. (Id. at 88, 106.) A job coach still occasionally helps him by making sure he is doing his job correctly and not

http://www.med.nyu.edu/content?ChunkIID=648216 (last visited Oct. 30, 2013).

[2]Plaintiff lists "several palsy" as a disabling impairment. A reference search failed to reveal such a diagnosis. A review of the administrative record failed to reveal any diagnosis of cerebral palsy. Thus, the Court will simply refer to "palsy" without any further definition.

[3]References to "R." are to the administrative record filed by the Commissioner with her answer.

[4]L.P.C. is an abbreviation for Licensed Professional Counselor; C.V.E. is for Certified Vocational Evaluator; C.R.C. is for Certified Rehabilitation Counselor.

getting into arguments with other people.  (Id. at 88, 95.)  He does not have any problems doing the job.  (Id. at 96.)  He is working five days a week, eight hours a day for approximately seven to eight dollars an hour.  (Id. at 89, 96.)  He has a driving permit, but not a driver's license.  (Id. at 89, 97.)  He is planning on buying a new car when he gets his license.  (Id. at 97.)  Plaintiff is paid every two weeks.  (Id. at 90.)  His pay is directly deposited.  (Id.)  When he shops, he pays cash or uses his debit card.  (Id.)  His mother or stepfather go with him.  (Id.)  His stepfather keeps his debit card.  (Id. at 93.)  He can make change and knows if the correct change is given him.  (Id. at 90-91.)

Plaintiff further testified that he was going to be receiving some additional job training at a community college so he will "have something to fall back on."  (Id. at 104.)

He takes Adderall[5] daily, and does not need to be reminded to do so.  (Id. at 91.)  The Adderall helps him stay calm.  (Id.)

Plaintiff testified that he does not have any friends in his new neighborhood.  (Id. at 92, 99.)  He hangs out with his family and occasionally visits his friends in his old neighborhood.  (Id.)  If he goes to the movies, his parents take him and he pays for the ticket.  (Id. at 92.)  He is good at board and electronic games.  (Id. at 105-06.)  He regularly attends church.  (Id. at 106.)

Asked if Plaintiff was engaged in substantial gainful work, Mr. Israel replied that he apparently was.  (Id. at 108.)  He was then asked to assume a hypothetical claimant who had

---

[5]Adderall, a combination of amphetamine and dextroamphetamine, is used to treat ADHD. See Adderall, http://www.drugs.com/adderall.html (last visited Oct. 30, 2013).

marked limitations in his ability to understand, remember, and carry out detailed instructions; moderate limitations in his ability to maintain attention and concentration for extended periods; moderate limitations in his ability to sustain an ordinary routine without special supervision; moderate limitations in his ability to work in coordination with or proximity to others without being distracted; moderate limitations in his ability to complete a normal work day and work week without interruptions from psychologically-based symptoms; moderate limitations in his ability to perform at a consistent pace without an unreasonable number and length of rest periods; moderate limitations in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; moderate limitations in his ability to be aware of normal hazards and respond appropriately; moderate limitations in his ability to travel in unfamiliar places or use public transportation; and moderate limitations in his ability to set realistic goals and make independent plans. (Id. at 109-10.) Asked if such a claimant can engage in sustained work activity, Mr. Israel replied that he can not be so engaged at a competitive level. (Id. at 110.) This claimant can, perhaps, work in a sheltered environment. (Id.)

If the foregoing limitations do not preclude the claimant from understanding, remembering, carrying out, and persisting at simple tasks; making simple, work-related judgments; relating adequately to co-workers and supervisors; and adjusting adequately to ordinary changes in the work routine or setting, the claimant can perform such jobs as the one Plaintiff is currently performing and also other jobs, e.g., cleaner, assembler, hand packer/wrapper, and product inspector/checker. (Id. at 110-11.)

The ALJ next asked Mr. Israel if the occasional presence of Plaintiff's job coach is an accommodation. (Id. at 112.) He replied that it was not if the frequency of the coach's visits diminished as the job was learned and it was if the coach's presence was continuous. (Id.) Plaintiff's counsel then inquired if the presence of the job coach since January 2008 was transitional or an accommodation. (Id. at 114.) Mr. Israel replied that "[i]t sounds like it's accommodated situation." (Id.) Whether it was or not depended on such considerations as how often the coach visited. (Id. at 114-15.) If the reference in the notes to Plaintiff needing "'continued job coaching'" was "merely an update by phone," it might not be an accommodation. (Id. at 115.)

The ALJ then inquired of Plaintiff about his job coach. Plaintiff sated that the coach came to see him on the job "[e]very once in a blue moon." (Id. at 116.) From January 2009 to the present, the coach had visited five or six times. (Id.) They did not speak on the telephone. (Id.) From January to December 2008, the coach visited approximately ten times. (Id.) If the coach were to stop coming, his job would not be more challenging. (Id. at 120.)

Plaintiff's hourly pay was recently decreased by a dollar because he did not perform well on a time test. (Id. at 117-18.) He was nervous. (Id. at 118.) He knows that he will "ace" the test the next time. (Id. at 118-19.)

Plaintiff, again represented by counsel; Gerald D. Belchick, Ph.D.; and Patricia Davis, Plaintiff's mother, testified at the second hearing.

At the beginning of the hearing, the ALJ clarified that the primary issue before him was whether the work that Plaintiff was doing was an accommodated job, i.e., whether he

was receiving extra help and, consequently, was not engaged in substantial gainful work activity.  (Id. at 25.)

Plaintiff testified that he had finished the twelfth grade and had been in special education classes for science, math, and literature.  (Id. at 30.)  He did not have a driver's license; his permit had expired.  (Id.)

Plaintiff was working as a janitor at Challenge Unlimited, an employment service for disabled people.  (Id. at 32-33, 57.)  His stepfather had helped him apply for the job.  (Id. at 33, 48.)  His stepfather used to work there, but no longer did.  (Id. at 48.)  Plaintiff has had the job for three years.  (Id. at 33.)  A job coach visits him once a week for approximately two hours.  (Id.)  Later in the hearing, he testified that the coach checks up on him once a month.  (Id. at 46-47.)  His contact with his coach is less than it was when he first started the job.  (Id. at 49.)  She helps him deal with his co-workers, who harass him.  (Id. at 34.)  If she did not come, he would have problems with his co-workers.  (Id. at 35.)  Plaintiff later explained that the same co-worker harasses him once a week because he likes to tease Plaintiff.  (Id. at 44-45, 51.)  This co-worker teases him even when the coach is there.  (Id. at 52.)  Plaintiff gets along with his supervisor.  (Id. at 47.)  He gets tired on the job and has to take a little break.  (Id. at 35.)  He also has a small problem staying focused.  (Id. at 35-36.)  His coach helps him stay focused.  (Id. at 36.)  Plaintiff testified that he does not think he could do his job without the coach, and also testified that he could.  (Id. at 44.)

"[A]ll in all, [Plaintiff] think[s] [he's] doing a pretty good job."  (Id. at 47.)  He has gotten a raise since he started at the job.  (Id. at 48.)  And, he has been given an award for

outstanding achievement.  (Id. at 55.)  He works eight hours a day, five days a week, and makes $10.96 an hour.  (Id. at 48.)

Plaintiff is still taking Adderall – one pill a day.  (Id. at 37.)  It causes him to lose his appetite and to be tired at the end of the day.  (Id. at 37.)

When Plaintiff is not working, he attends family functions or stays in his house.  (Id. at 39.)  He goes to Life Skills to help him with his social skills.  (Id.)  He does not have any friends.  (Id.)  He does not like to be out at night, and sleeps with his television and the lights on.  (Id. at 40.)

Plaintiff sees a doctor for anger management.  (Id. at 42.)  He does not hit people or throw things.  (Id. at 43.)

Mrs. Davis testified that she and her husband did not let Plaintiff get a driver's license because they were concerned about his safety and his lying.  (Id. at 59-60.)  Mrs. Davis explained that Plaintiff will go along with whatever is asked in order to avoid conflict and to not displease someone.  (Id. at 59-60, 68.)  She reported that the job coach will contact her about problems Plaintiff is having on the job.  (Id. at 61-62.)  For instance, Plaintiff has "a mouth on him" and sometimes gets into problems at work that are not related to the one bully.  (Id. at 62.)  He does not know how to get himself out of trouble.  (Id.)  She was not aware of any award given him for doing a good job.  (Id.)  The coach goes to Plaintiff's job at least twice a week and often for four to six hours each time.  (Id. at 63.)  The coach has told her that Plaintiff could not do the job without a coach because he cannot handle working with "regular employees."  (Id. at 66.)  Although he could do the work, he was easily distracted.

(Id.)  Also, she has to remind him to stay on task because he takes too long to do the work.

(Id.)  In the past forty-five days, his supervisor wrote him up for inappropriate behavior.  (Id. at 76.)  At work, Plaintiff is sporadically given tests of tasks to be performed within a certain time period.  (Id. at 77-79.)  If he does well, he is given a pay increase; if not, his pay is decreased.  (Id. at 78.)  He has received more decreases than increases.  (Id.)  He is still employed, however, because his attendance is good and they want to work with him.  (Id. at 79.)

Mrs. Davis further testified that Plaintiff cannot take the bus because he cannot tell time or directions.  (Id. at 67.)  Plaintiff testified that he is not allowed on the Bistate transit system because he "said the wrong thing."  (Id. at 57.)

Plaintiff is going to Life Skills because he wants to live on his own.  (Id. at 70-71.)  Her husband calls from out-of-town to make the arrangements for Plaintiff to get a ride to work.  (Id. at 72.)  Mrs. Davis handles Plaintiff's money for him.  (Id. at 74.)  He no longer has a debit card because he would take money out of his account and not know how he spent it.  (Id. at 75.)

Asked if Plaintiff's job was an accommodated one, Dr. Belchick, testifying as a vocational expert, replied, "[I]t's very definitely an accommodated job."  (Id. at 80.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, assessments of

his mental capabilities, and records from school, health care providers, vocational assistance agencies, and support groups.

When applying for SSI, Plaintiff completed a Disability Report.  (Id. at 276-83.)  He is 6 feet 2 inches tall and weighs 156 pounds.  (Id. at 276.)  His impairments, see pages one to two, supra, limit his ability to work by causing him to be easily distracted, have difficulty concentrating and remembering instructions, and not understand danger or money.  (Id. at 277.)  He has had these difficulties since birth.  (Id.)

Also when Plaintiff applied for SSI, the interviewer noted that Plaintiff's mother answered most of the questions.  (Id. at 266.)  Although Plaintiff "was capable of having a basic conversation, . . . he was not able to conduct interview on his own."  (Id.)

On a Function Report, Plaintiff described what he does during the day.  (Id. at 268.) He uses the bathroom, washes his hands and face, drinks water, makes a sandwich, watches cartoons on television, gets dressed, goes to the park, comes home, listens to the radio, takes a nap, makes another sandwich, and watches music videos.  (Id.)  He does not take care of anyone else or of any pets.  (Id. at 269.)  He has no problem with personal hygiene tasks. (Id.)  He mows the grass, washes dishes, and takes the trash out.  (Id. at 270.)  He needs to be reminded to complete these chores and to focus.  (Id.)  He goes outside, but cannot go alone.  (Id. at 271.)  He does not drive, and does not know why he doesn't.  (Id.)  He attends church and family events weekly.  (Id. at 272.)  His impairments adversely affect his abilities to sit, talk, remember, complete tasks, concentrate, understand, follow instructions, and get along with others.  (Id. at 273.)  He cannot follow written or spoken instructions well, and

needs both repeated multiple times.  (Id.)  His ability to handle stress and changes in routine is "fair."  (Id. at 274.)

A Disability Report – Appeal form was completed for Plaintiff by his stepfather, Jeffrey Davis, after the initial denial of his application.  (Id. at 325-30.)  Mr. Davis reported that, beginning approximately on August 20, 2007, Plaintiff was unable to follow instructions and often forgot household rules.  (Id. at 326.)  As of September 15, 2007, Plaintiff did not have a concept of time or of money.  (Id.)

An earnings report generated for Plaintiff during the first quarter of 2011 lists annual reportable earnings of $11,683[6] in 2008, $15,336 in 2009, and $17,202 in 2010.  (Id. at 261.)

School Records.  December 2001 records from the Special School District of St. Louis County list a composite score for Plaintiff of 80 on the Stanford-Binet Intelligence Test, Fourth Edition, placing him in the low average range of cognitive ability.  (Id. at 308-15.) His academic achievement scores in math reasoning and written expression were of particular concern and were considered "a function of his learning disability."  (Id. at 312-13.)  It was noted that Plaintiff's ADHD was being addressed by his pediatrician.  (Id. at 313.)

December 2006 records from the District list educational diagnosis for Plaintiff of a learning disability in math reasoning and written expression.  (Id. at 287-306.)  He had difficulties staying focused and "often need[ed] to be prompted to get back on task."  (Id. at 288.)  He required extended time to complete assignments, benefitted from immediate feedback about his assignments, and had to be frequently monitored to determine whether he

---

[6]All amounts are rounded to the nearest dollar,

was understanding the material. (Id. at 289.) He spoke well and volunteered to help others. (Id.) He was to be placed outside the regular classroom 21 to 60% of the time. (Id. at 296.) Plaintiff wanted on-the-job training for a computer technician position. (Id. at 297.)

Medical Records. The medical records of Plaintiff's pediatrician, Christina Ruby-Ziegler, M.D., generally consist of renewals of prescriptions or notes from his annual visit.

The former include prescriptions for Dexedrine[7] renewed in January, March, June, August, November, and December 2000 and in February and March 2001. (Id. at 347-48, 351.) Beginning in January 2005,[8] Plaintiff was prescribed Adderall.[9] (Id. at 359.) This prescription was renewed in February, April, May, June, August, September, and December 2005; in January, February, March, May, August, October, and November 2006; in January, March, April, July, and December 2007; in March, April, May, June, July, September, and November 2008; and in January, February, March, April, May, June, and July 2009. (Id. at 359-61, 533, 535, 537, 553, 554, 556, 558, 567-68, 571, 675-77.)

Plaintiff had annual check-ups with Dr. Ruby-Ziegler in September 2000, August 2001, September 2002, November 2004, October 2006, and October 2008. (Id. at 349, 352, 354, 358, 362, 536, 569, 571.) In October 2003, Plaintiff was seen by Ralph Wuebker, M.D., another physician in Dr. Ruby-Ziegler's practice. (Id. at 357.)

---

[7]Dexedrine is a brand name for destroamphetamine and is used to treat ADHD. PDR at 1342.

[8]A record of an annual visit in 2003 indicates that Plaintiff was being prescribed Adderall by the practitioners at St. Louis Children's Hospital. (Id. at 357.)

[9]See note 5, supra.

It was noted at his August 2001 visit that he was off his medications during the summer and was whiny, fidgety, and ignoring people.  (Id. at 352.)  It was noted at his September 2002 visit that he was not taking Wellbutrin[10] during the summer.  (Id. at 354.)  At Plaintiff's October 2008 annual visit, his stepfather reported that he was working, but would lose focus and become distracted.  (Id. at 569.)  A ten milligram dosage of Adderall was added to the thirty milligram dosage, which had previously routinely been prescribed.  (Id.)  Blood work was within normal limits.  (Id. at 571.)

Plaintiff saw Dr. Ruby-Ziegler in January 2008, reporting that he had been going to The Center for Head Injury Services since December 31, 2007, was feeling okay, and had no pain.  (Id. at 555.)  His heart rate and blood pressure were increased.  (Id.)  Plaintiff was to have an electrocardiogram (EKG) and his parents were to check his pulse once a day.  (Id.)

In February 2010, Plaintiff saw Charles Lieu, M.D. to establish a patient relationship as an adult.  (Id. at 740-42.)  It was noted that his stepfather worked at the Records Center.  (Id. at 740.)  It was reported that the second, ten milligram dose of Adderall had been earlier added to his medication regimen because Plaintiff was getting anxious and agitated on the Call-A-Ride bus.  (Id.)  He would get upset if the bus was late and would talk loudly on the bus.  (Id.)  On examination, with the exception of a bunion on his left foot, there were no other physical or mental abnormalities.  (Id. at 741-42.)

---

[10]Wellbutrin is prescribed for the treatment of major depressive disorder.  PDR at 1616.  The record does not indicate when it was prescribed or why.

The two doses of Adderall were again prescribed by Dr. Lieu in September 2010 and in March, June, and July 2011. (Id. at 727-38.) The March 2011 record lists a diagnosis of ADHD, combined type. (Id. at 732.)

In July 2011, on Dr. Lieu's referral, Plaintiff saw Robert H. Rifkin, M.D. (Id. at 721-23.) It was reported that he had been diagnosed with ADHD in middle school, has difficulty focusing, and takes 30 milligram and 10 milligram doses of Adderall every day. (Id. at 721.) He had worked as a janitor for three years at the Records Center. (Id. at 722.) His job might be in jeopardy. (Id.) Plaintiff's mother reported that Plaintiff had been in special education, had repeated third grade, and had been diagnosed with mild mental retardation. (Id.) He had been prescribed Ritalin[11] when in middle school. (Id.) He was upset by his co-workers; he thought he was getting caught for things they were not. (Id. at 723.) He needed to "talk out his pent up anger." (Id.) Dr. Rifkin rated his Global Assessment of Functioning to be 55.[12] (Id.) Plaintiff was to return in one month. (Id.)

Vocational Records. In October 2007, the fall after graduating from high school, Plaintiff met with Debbie Mayes, a vocational rehabilitation counselor with the Missouri

---

[11]Ritalin is a central nervous stimulant used in the treatment of ADHD. Ritalin, http://www.drugs.com/ritalin.html (last visited Oct. 30, 2013).

[12]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

Division of Vocational Rehabilitation. (<u>Id.</u> at 333-34, 575-76.) When a student, Plaintiff had worked stocking grocery shelves and doing laundry at a hotel; he had enjoyed both and would do them again. (<u>Id.</u> at 333.) His impediments to employment were not being able to complete forms, read instructions, make good decisions, stay on task, and finish a job. (<u>Id.</u> at 333, 339.) He would "need services of supported employment job coaching to maintain employment." (<u>Id.</u> at 333.) He also had difficulty recognizing appropriate social boundaries. (<u>Id.</u> at 333-34, 339.) He did not ride the bus, but might be able to with appropriate training. (<u>Id.</u> at 333-34.) Ms. Mayes further reported that Plaintiff's disabilities, including mental retardation, affected his ability to use the bus in that he could not read street signs and could potentially be placed in jeopardy because he was easily taken advantage of by others. (<u>Id.</u> at 337.) She classified him as being in the "Most Significant Disability" category because he was seriously limited in three or more functional capacities, i.e., communication, self-direction, work skills, and interpersonal skills. (<u>Id.</u> at 340-42, 575.) He was limited in his functional capacity for communication because he could not read or write at a level that would allow written communication; consequently, job instructions would have to be given orally and be repeated. (<u>Id.</u> at 575-76.) He was limited in his capacity for self-direction because he "[did] not make good decisions, particularly when associating with peers." (<u>Id.</u> at 576.) He gave money to friends and associates so they could buy marijuana, "ha[d] difficulty saying 'no' to others," and "ha[d] significant difficulty staying on task, finishing a job, etc." (<u>Id.</u>)

After meeting with Ms. Mayes, Plaintiff and his mother chose to have Plaintiff undergo a vocational evaluation at The Center for Head Injury Services. (Id. at 578.) Plaintiff underwent this evaluation from December 31, 2007, to January 25, 2008. (Id. at 364-90, 579-81, 583, 642-62.) With the exception of two days he was absent due to transportation problems and one day of unexcused absence, Plaintiff attended all sessions and took various tests, including reading and arithmetic tests; the Wechsler Memory Scale, Third Edition; lifting and balancing tests; and fine motor skills tests. (Id. at 364, 369-82, 385, 386.) It was noted after the second week that Plaintiff "required more one on one attention from staff than necessary, possibly due to his lack of work history." (Id. at 580.) His processing speed, fine motor coordination, and visual tracking skills were of concern. (Id.) His strengths were a basic reading ability, attendance, initiation, acceptance of supervision, and being flexible when given thorough directions. (Id. at 364, 386.) His limitations included decreased short-term memory, comprehension, knowledge, processing speed, and problem-solving skills. (Id. at 364-65, 386.) "[H]e demonstrated good recall of hands on tasks from day to day and appeared to benefit from a simple written schedule and routine/repetitive tasks." (Id. at 364-65.) Suitable vocational goals included courtesy clerk and retail stocker. (Id. at 365, 386.) He had poor insight into his abilities and named security guard and actor as vocational interests, both of which the counselor, Melissa Hoppe, Vocational Evaluator, considered unrealistic. (Id. at 365.) She concluded that he would need (1) positions that involved repetitive tasks that did not initially exceed three to five steps; (2) job coaching;

and (3) positions that allowed him to use his hands[13] and did not require more than medium physical demands.  (Id.)  With training, he could ride the bus if he did not have to transfer more than once.  (Id.)  He "demonstrated fair time management skills" when there were clocks around the facility.  (Id. at 366.)

At the conclusion of the evaluation, Plaintiff was to begin the Community Rehabilitation Services (CRS) program.  (Id. at 582.)  In a March 2008 report of his participation in that program, Plaintiff's strengths were described as including his good attendance, his motivation to complete his assigned tasks, his promptness when starting work, and his ability to independently follow his schedule.  (Id. at 633-37.)  His limitations included decreased short-term memory and decreased problem solving skills.  (Id. at 634.)  Consequently, he benefitted from a written schedule, routine or repetitive tasks, demonstrations of what to do, and simple explanations.  (Id.)  He "would be most successful in positions that involved repetitive tasks from day to day and involved job coaching and natural supports . . . ."  (Id.)

While participating in the program, Plaintiff was hired on February 29, 2008, by Challenge Unlimited to work as a janitor at the Federal Records Center.  (Id. at 475, 585, 587, 595.)  It was decided that he would need a job coach at his new position.  (Id. at 583, 588-89.)  The job coach, Lashonda Clark, developed visual guides to help Plaintiff learn his job duties.  (Id. at 593.)  It was later noted that Plaintiff had gotten the job with help from his stepfather.  (Id. at 637.)

---

[13]Testing revealed that Plaintiff's speed and accuracy improved with repetition and practice when he performed hands-on tasks.  (Id. at 366.)

In his March 29, 2008, performance evaluation after his first month at work, Plaintiff's major strengths were cooperation and motivation.  (Id. at 498.)  His major needs were job knowledge and maturity.  (Id.)  His functional limitations were work tolerance, self-direction, and work skills.  (Id. at 447-49, 465, 492-99.)  His work accommodations included being given extra time on tasks; being given verbal and written instructions; being given immediate feedback on errors and on suggestions of how to correct those errors; being allowed time to adjust to changes; and being offered instructions on how to adapt to new circumstances.  (Id. at 448.)  His first goal was to develop skills in retaining the requirements of the job in order to be more independent.  (Id. at 499.)  His second goal was to utilize his time at work to the maximum, to complete his work before socializing, and to not engage in any offensive behavior or speech.  (Id.)  The reviewer opined that Plaintiff "ha[d] not demonstrated the ability to perform in his position to conclude that he will be able to sustain competitive employment at this time."  (Id. at 449.)

The next day, a monthly performance assessment was completed for Plaintiff.  (Id. at 445-46.)  He required supervision 67 to 99% of the time.  (Id. at 445.)  He usually listened well, but did not like to be criticized.  (Id. at 445-46.)  He did not take criticism well.  (Id. at 446.)  The April performance assessment noted that Plaintiff  needed a job coach.  (Id. at 443-44.)  On the May performance assessment, Plaintiff was described as needing supervision 34 to  66% of the time, being "a little" hyperactive, and needing a list of tasks.  (Id. at 441-42.)  The percentage of time Plaintiff required supervision did not change in the June performance assessment.  (Id. at 439-40.)  He followed instructions when his job coach

- 17 -

was with him.  (Id. at 439-40.)  He completed his work, but occasionally moved slowly.  (Id. at 439.)  He became nervous if he was told to redo a task.  (Id. at 440.)

Later in June, a meeting was held at CRS to address several issues Plaintiff was having at his job, including following through with work assignments, having a slower pace when given a new assignment, thoroughly completing his job tasks, and making inappropriate comments to co-workers.  (Id. at 595.)  Ms. Clark was to continue as Plaintiff's job coach and was to try to reduce her coaching hours.  (Id.)  Her services were authorized for nine months or 25% or less of job coaching time, whichever came first.  (Id. at 597.)

In the July performance assessment, it was noted that Plaintiff required supervision 100% of the time, occasionally did not listen, and was nervous.  (Id. at 437-38.)  His job coach was always with him.  (Id. at 438.)  The percentage of time Plaintiff needed to be supervised was reduced to 67 to 99% in his August performance assessment. (Id. at 435-36.) Plaintiff had difficulties keeping his mind on his work.  (Id. at 435.)  He could handle criticism.  (Id. at 436.)  Also in August, Ms. Clark advised CRS that Plaintiff was still not at 25% and was nearing the end of his second three-month period of job coaching.  (Id. at 598.)

At a CRS staffing meeting held on September 3, Plaintiff was "very restless and nervous."  (Id. at 599.)  Ms. Clark explained that he behaved so when around people he did not know well.  (Id.)  It was noted at Challenge Unlimited on September 29 that Plaintiff was preoccupied with checking his telephone and talking with co-workers.  (Id. at 462.)  His job coach worked with him every day "from task to task" to help him stay focused.  (Id.)  His

supervisors noted that he was nervous sometimes when another person was working around him.  (Id.)

The next day, Plaintiff was given a Corrective Action Record at the Records Center for breaking rules on the job site.  (Id. at 421.)  He had locked himself in a bathroom stall, sat on the floor, and refused to come out.  (Id.)  At a CRS meeting the next week, Ms. Clark advised Ms. Mayes that Plaintiff had been written up twice.  (Id. at 602.)  The first time was when a supervisor found him in a restroom stall playing a game on his cell phone.  (Id.)  The second time was when another supervisor found him in the restroom, asked if he was okay, and was told by Plaintiff to leave him alone and that it was "none of [his] business."  (Id.)  Plaintiff's assignment was changed to a large room.  (Id.)  It was noted that this was his third position and that he had been cautioned that if he did not do well in the new location, he would be fired.  (Id.)  It was also noted that Plaintiff acknowledges that he has done something wrong when told so by Ms. Clark, but explains that he cannot help himself.  (Id.)

Plaintiff's September 31 performance assessment again noted that he required supervision 67 to 99% of the time.  (Id. at 433-34.)  Plaintiff would forget to do a task and have to go back over his work.  (Id. at 434.)

In an October 14 time study, Plaintiff demonstrated an increase in his productivity rate from 70.04808 to 82.29230% and a corresponding increase in his hourly pay rate.  (Id. at 455-56.)

In his November performance assessment, Plaintiff reportedly required supervision 34 to 66% of the time.  (Id. at 429-30.)  He talked too much, did not always accept criticism,

interfered in others' business, and did not get along with co-workers.  (<u>Id.</u> at 430.)  Also that month, Ms. Clark informed Ms. Mayes that Plaintiff did well at his job when she was there, but made inappropriate comments to others when she was not.  (<u>Id.</u> at 603.)  Plaintiff was to "move into retention on 12/10/08," after having then been in individual job coaching for at least nine months.  (<u>Id.</u>)  It was later noted that Plaintiff was down to 21% job coaching by the end of November.  (<u>Id.</u> at 604.)

Plaintiff was described in his December performance assessment as occasionally not wanting to cooperate.  (<u>Id.</u> at 427-28.)  He completed his assignments, but was not accurate.  (<u>Id.</u>)  He did not listen to the lead person or to his supervisor.  (<u>Id.</u> at 428.)

Plaintiff was making $7.75 an hour at the end of 2008.  (<u>Id.</u> at 666.)

In his January 2009 performance assessment, he was described as occasionally not wanting to follow instructions and having to go over his work.  (<u>Id.</u> at 425-26.)  Also, he talked too much and did not accept criticism.  (<u>Id.</u> at 426.)

On February 4, Debbie Boyd, a program coordinator for The Center for Head Injury Services, wrote:  "Since the onset of employment [Plaintiff] has demonstrated the ability to learn at a relatively even pace duties required for his position and to date shown independence and success.  His supervisors continue to express satisfaction regarding his work performance. . . .  In [Plaintiff's] behalf, as a means of continued employment support, follow-along retention services will be maintained . . . ."  (<u>Id.</u> at 668.)

On February 15, Plaintiff had an annual performance assessment.  It was noted that Plaintiff sometimes had to be calmed down and that he did not get along with some of his co-

workers.  (Id. at 423-24, 500-07.)  His major strengths were cooperation and motivation.  (Id. at 506.)  His major needs were productivity and maturity.  (Id.)  He had met the first goal in the previous performance evaluation, but continued to try to meet his second goal.  (Id. at 507.)  His new first goal was to focus on work and try not to interfere with others' business.  (Id. at 506.)

A monthly performance assessment completed at the end of the month listed Plaintiff's functional limitations as being work tolerance, self-direction, and work skills.  (Id. at 422, 450.)  The reviewer noted that Plaintiff had difficulties remaining focused on tasks, was "preoccupied with chatting to those around him," "like[d] to meddle in others' business," and "need[ed] much supervision at his site to ensure his work."  (Id. at 450.)  His immaturity and constant talking lessened the quality of his work.  (Id.)

In addition to the above-described reports of Plaintiff's progress at work, Ms. Clark issued monthly progress reports to The Center for Head Injury Services.

The first report was made on March 31, 2008.  Plaintiff was then receiving job coaching 78% of his work day.  (Id. at 630-32.)  He was inconsistent when performing tasks, jumped from one task to another without completing the first one he had started, and did not pay attention.  (Id. at 631.)  He became frustrated when asked to do something extra and questioned his supervisors.  (Id. at 632.)  The following month, he was receiving job coaching 53% of the time.  (Id. at 627-29.)  He had not made much progress.  (Id.)  He "display[ed] a lot of frustration and ha[d] a defensive response when corrected . . . ."  (Id. at 628.)  He took direction more easily from men than from women.  (Id.)  He had to have the last word

and was very argumentative. (Id.) As before , he was inconsistent and jumped from task to task. (Id.) He was unable to clean all his assigned rooms because of his time management difficulties. (Id.) He did not pay attention when working, knocking things over, dropping bags, and accidentally hitting people with a broom or mop handle. (Id.)

In her May report, Ms. Clark listed the percentage of her time spent job coaching Plaintiff as 54. (Id. at 624-26.) He knew how to do the work, but did not do it if support staff was not there. (Id. at 625.) His duties had changed to cleaning the men's restrooms only. (Id.) As before, he did not show any consistency in performing tasks and would change from one to another. (Id.) As before, he did not pay attention when working. (Id.) He had not made much progress. (Id. at 626.) The staff was working on a new task list for him. (Id.)

Ms. Clark's job coaching time had increased to 58% in her June report. (Id. at 618-23.) Plaintiff continued to have the same problems as before. (Id. at 619.) At least once a day, he would drop a trash bag on floor, accidentally hit someone with a broom and mop handle, or spill the mop bucket on floor. (Id.) He had been given a list breaking down his tasks in fifteen-minute intervals, had taken it home, and had forgotten to bring it the next day (Id. at 620-23.)

In July, Ms. Clark's job coaching time was 43%. (Id. at 615-17.) Plaintiff had shown some improvement, but would slack off if he did not feel like doing his job and would decrease his pace. (Id. at 616.) He had been spoken to about "having to have the last word, his attitude with his co-workers, and being a team player." (Id.)

Ms. Clark's job coaching time was reduced to 23% when reported on September 2. (Id. at 612-14.)  Plaintiff had shown a small improvement in the quality of his work.  (Id. at 613.)  He had, however, received a verbal warning about telling his supervisor he had cleaned part of his assignment when he had not.  (Id.)  As before, he slacked off when not wanting to work, would decrease his pace, and had been spoken to about his attitude, his need to have the last word, and being a team player.  (Id.)

At the end of the month, Ms. Clark's job coaching time had increased to 49%.  (Id. at 609-11.)  Plaintiff's work quality had not improved and he had been written up twice.  (Id. at 610.)  His job assignment had been changed.  (Id.)

On October 31, Ms. Clark's job coaching time had again increased, and was 59%.  (Id. at 606-08, 671-73.)  Plaintiff's new job assignment was a room where all the personnel files were kept and was "locked and secured . . . and away from the rest of his co-workers."  (Id. at 607.)  Consequently, Plaintiff was keeping "out of trouble" and doing well.  (Id.)  He continued to need verbal reminders and cues from the support staff and from his supervisors. (Id.)  They had spoken to him about his speed and pace.  (Id. at 608.)

In March 2009, Jim Hastings, a project manager for Challenge Unlimited, answered several questions posed by Plaintiff's counsel.  (Id. at 247.)  He explained that Plaintiff's pay rate, currently $8.23 per hour, was based on the productivity percentage, i.e., the time it took him to complete a time study, of the base janitorial pay rate of $10.15 per hour.  (Id.) Plaintiff achieved a productivity percentage of 81.8 at his last study.  (Id.)

Life Skills.  As Plaintiff explained when testifying at the second hearing, he attended Life Skills to help him with his social skills.

The first quarterly report of Plaintiff's participation was for the period from July to September 2010 and listed three goals:  (1) "independently make purchases, correctly identifying the value of coins and bills, for six consecutive months"; (2) introducing himself and asking questions or commenting on the topic of conversation; and (3) making safe choices and understanding "the concept of wait time."  (Id. at 680.)  The first goal was met during that period.  (Id.)  The second goal was partially met in that Plaintiff would introduce himself, but he did not engage in conversation.  (Id.)  The third goal was not addressed.  (Id.)

During that quarter, Plaintiff's participation included going bowling, meeting the Life Skills staff at the library, going to the mall, and working on introducing himself and using money.  (Id. at 684-90.)

During the quarter from October to December 2010, Plaintiff again went bowling and to the library and also went to Dave & Busters.  (Id. at 691-99.)  He had no problem handling dollar bills, but did have difficulties when counting change.  (Id. at 694-95.)  The staff discussed with him what to do if he was lost.  (Id. at 695.)  Plaintiff reported he did not go out at night.  (Id.)

The report for the quarter from January to March 2011 describes the first goal as being met 95% of the time.  (Id. at 681-82.)  Plaintiff could use a debit card, and preferred to do so.  (Id.)  As to the second goal, he would offer his hand and introduce himself and could make his needs and wants known in the community.  (Id.)  He was to "continue to work on

conversation starters and endings." (Id.) As to the third goal, he was "stranger aware," but was too trusting when it came to acquaintances. (Id.) He was to work on being patient. (Id.) During this quarter, Plaintiff and staff met at his house and at the mall. (Id. at 700-09.) At one meeting, he reported that his mother was going to Australia for two weeks and he would be left at home with friends and family to check on him. (Id. at 704.) A few days later, Plaintiff was anxious when he met with staff, explaining that he had been told he would have to take seven days of vacation when his parents were in Australia and he would then be home all day by himself. (Id.) He was trying to contact his mother. (Id.) Once he spoke with her, he calmed down. (Id.)

Plaintiff's meetings with the Life Skills staff in April and May 2011 were about him transitioning to the career development phase of the program. (Id. at 710-16.)

Additional Information Before the ALJ. Ms. Mayes wrote on December 13, 2010:[14]

[Plaintiff] received supported employment services from Vocational Rehabilitation and The Center for Head Injury Services to help him find and maintain employment. It should be noted that [Plaintiff] had a considerable amount of problems on his job, but was able to maintain employment with the assistance of job coaching services. Although his case with Vocational Rehabilitation is closed, he will continue to need job coaching retention services, indefinitely to keep his job. . . . He is considered to be a Category I client with Vocational Rehabilitation which means he is/was classified as a client with a most significant disability."

(Id. at 510.)

---

[14]This letter was submitted to the Appeals Council pursuant to Plaintiff's first request for review. It and the two other communications that follow were before the ALJ on remand.

Also in December 2010, Dale Sheet, the director of employment services for Challenge Unlimited, completed an employment questionnaire. (<u>Id.</u> at 514-19.) He reported that Plaintiff had been granted several special considerations, including fewer or easier duties; special supervision; lower quality and production; extra help from his co-workers; lower efficiency; and special transportation. (<u>Id.</u> at 514.) The only special considerations he was not granted were fewer or irregular hours, frequent absences, more rest periods, and special equipment. (<u>Id.</u>) He did not have trouble relating to co-workers or "dealing with normal work stress." (<u>Id.</u>) He was given extra support to help him with his work. (<u>Id.</u>) He was sometimes distracted. (<u>Id.</u> at 516.)

Laura Yn, an employment specialist with The Center for Head Injury Services, wrote in May 2011 that Plaintiff had been receiving retention job coaching support since December 2008, without which he would have difficulty maintaining employment. (<u>Id.</u> at 524.)

Also before the ALJ were assessments of Plaintiff's mental functional limitations and abilities.

In August 2007, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, R. Cottone, Ph.D. (<u>Id.</u> at 538-48.) Plaintiff was described as having organic mental disorders, i.e., a learning disability, ADHD, and borderline intellectual functioning. (<u>Id.</u> at 538, 539.) These disorders resulted in Plaintiff experiencing mild restrictions in his activities of daily living, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (<u>Id.</u> at 546.) He had not had repeated episodes of decompensation of extended duration. (<u>Id.</u>)

On a Mental Residual Functional Capacity Assessment, Dr. Cottone assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two.  (<u>Id.</u> at 416.)  In the area of sustained concentration and persistence, Plaintiff was markedly limited in one of eight listed abilities, i.e., carrying out detailed instructions, and moderately limited in four other abilities, i.e., maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being distracted by them; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  (<u>Id.</u> at 549-50.)  There was no evidence he was limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (<u>Id.</u> at 550.)  He was not significantly limited in the other two seven abilities.  (<u>Id.</u> at 549, 550.)  In the area of social interaction, Plaintiff was moderately limited in one of the five abilities, i.e., getting along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (<u>Id.</u> at 550.)  He was not significantly limited in two other abilities and had no evidence of limitations in the remaining two abilities.  (<u>Id.</u>)  In the area of adaptation, Plaintiff was moderately limited in all but one of the four abilities:  the ability to (1) be aware of normal hazards and take appropriate precautions; (2) travel in unfamiliar places or use public transportation; and (3) set realistic goals or make plans independently of others.  (<u>Id.</u>)

## The ALJ's Decision

The question before the ALJ on remand by the Appeals Council, and the question at issue in the parties' respective briefs is whether Plaintiff has been engaging in substantial gainful activity since beginning work in February 2008.

In deciding the question, the ALJ considered the February 2009 assessment of Ms. Boyd, the December 2010 letter from Ms. Mayes, the December 2010 questionnaire answered by Mr. Sheet, and the May 2011 letter from Ms. Yn. (Id. at 13.) He also considered Plaintiff's ability to work full-time since March 2008 and his projected annual earnings of $21,372 based on a 37.5 hour work week and an hourly pay rate of $10.96. (Id.) The ALJ found it "incredible" that Plaintiff was able to increase his hourly rate from $7.75 to $10.96 without satisfying his supervisor and employer. (Id.) "There [was] no evidence of any suspension, fines or employer sanctions by virtue of any inappropriate behavior or improper performance of work duties." (Id.)

The ALJ also found no evidence that Plaintiff currently needed a job coach, noting that Plaintiff had "testified that his job coach saw him every 'once in a blue moon.'" (Id. at 13-14.) Even so, Plaintiff "was able to satisfy supervisors and employers in order to maintain his job and receive regular increases in salary by virtue of increased ability to more timely perform his duties." (Id. at 14.)

The ALJ recognized that Plaintiff had recently needed help from a job coach to deal with a bully and has "awkward social skills." (Id.)

And, after reviewing Mrs. Davis's testimony, the ALJ considered it to be supportive of his finding that Plaintiff does not need a job coach. (Id.)

The ALJ then concluded that Plaintiff had been engaged in substantial gainful activity since February 2008 and that there had not been, as required by the Act, a continuous twelve-month period during which he had not been so engaged since filing his SSI application in June 2007. (Id.) Plaintiff was not, therefore, disabled within the meaning of the Act. (Id.)

## Discussion

Under the Title XVI of the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity. See 20 C.F.R. § 416.920(a)(4)(i); **Myers v. Colvin**, 721 F.3d 521, 523 (8th Cir. 2013). "If so, the claimant is not disabled." **Cuthrell**, 702 F.3d at 1116; accord **McCoy**

**v. Astrue**, 648 F.3d 605, 611 (8th Cir. 2011); **Dukes v. Barnhart**, 436 F.3d 923, 927 (8th Cir. 2006).[15]

"To qualify as substantial gainful activity, the work activity must be both substantial and gainful." **Comstock v. Chater**, 91 F.3d 1143, 1145 (8th Cir. 1996) (citing 20 C.F.R. § 416.972). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work merely means work done for compensation." **Comstock**, 91 F.3d at 1145 (citing 20 C.F.R. § 416.972(b)).

Time spent at work, while important, is not the only consideration when determining whether a claimant is performing substantial work activity. 20 C.F.R. § 416.973(e). Other considerations are defined in the regulations as follows.

> How well you perform. We consider how well you do your work when we determine whether or not you are doing substantial gainful activity. If you do your work satisfactorily, this may show that you are working at the substantial gainful activity level. If you are unable, because of your impairments, to do ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work, this may show that you are not working at the substantial gainful activity level. If you are doing work that involves minimal duties that make little or no demands on you and that are of little or no use to your employer, or to the operation of a business if you are self-employed, this does not show that you are working at the substantial gainful activity level.

> If your work is done under special conditions. The work you are doing may be done under special conditions that take into account your impairment, such as work done in a sheltered workshop or as a patient in a hospital. If your work is done under special conditions, we may find that it does not show that

---

[15]The remaining four steps are whether the claimant is severely impaired; whether the impairment, or combination thereof, is, or is comparable to, a listed impairment; whether the claimant can perform past relevant work; and, if not, whether the claimant can perform any other kind of work. **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010).

you have the ability to do substantial gainful activity. Also, if you are forced to stop or reduce your work because of the removal of special conditions that were related to your impairment and essential to your work, we may find that your work does not show that you are able to do substantial gainful activity. However, work done under special conditions may show that you have the necessary skills and ability to work at the substantial gainful activity level. Examples of the special conditions that may relate to your impairment include, but are not limited to, situations in which –

(1) You required and received special assistance from other employees in performing your work;

(2) You were allowed to work irregular hours or take frequent rest periods;

(3) You were provided with special equipment or were assigned work especially suited to your impairment;

(4) You were able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work;

(5) You were permitted to work at a lower standard of productivity or efficiency than other employees; or

(6) You were given the opportunity to work, despite your impairment, because of family relationship, past association with your employer, or your employer's concern for your welfare.

20 C.F.R. § 416.973(b) and (c).

Substantial gainful activity is presumed if the claimant's average earnings are greater than a set amount. See **Comstock**, 91 F.3d at 1145; 20 C.F.R. § 416.974(a)(1). Earnings that ordinarily show a claimant is engaged in substantial gainful activity were $940 per month, or $11,280 per year, in 2008; $980 per month, or $11,760 per year, in 2009; and $1,000 per month in 2010 and 2011. 20 C.F.R. § 974(b)(2)(ii); S.S.A. Substantial Gainful Activity, http://www.ssa.gov/oact/cola/sga.html (last visited Nov. 20, 2013). Plaintiff earned $11,683

in 2008, $15,336 in 2009, and $17,202 in 2010.  At the end of 2008, he was earning $7.75 an hour; in the first half of 2011, he was earning $10.96 an hour.  Consequently, his earnings for 2011 were on target to be greater than the $12,000 amount considered substantial gainful activity.

After finding that Plaintiff's earnings exceeded the set amount,  the ALJ concluded that there were no special conditions that rebutted the presumption that Plaintiff's work was not substantial gainful activity.  The Court disagrees.

First, there were "specially arranged circumstances" that allowed Plaintiff to work. For instance, his stepfather arranged for his transportation to a place he worked for at least three years.  Indeed, even when his stepfather was stationed out-of-state, he arranged for Plaintiff's daily transportation.  **Boyes v. Sec. of Health and Human Servs.**, 46 F.3d 510, 512 (6th Cir. 1994) (holding that ALJ had erred when finding that claimant's past work was substantial gainful activity; claimant had relied on special transportation to get to and from work and had needed constant on-site supervision to get work done).  Second, contrary to the ALJ's assertion there was no evidence of any employer sanction because of inappropriate behavior or improper job performance, there was evidence that Plaintiff had received verbal warnings and been transferred from job assignments due to improper behavior.  Due to such behavior and to inadequate job performance, after being transferred from two other job assignments, Plaintiff was assigned to one room where he had no contact with co-workers and no distractions.  See **Sheppard v. Astrue**, 426 Fed.Appx. 608, 611 (10th Cir. 2011) (remanding for further consideration disability benefit and supplemental security income

applications of claimant who was found not disabled at step one, but who "was having difficulties with his job in terms of personal relationships with coworkers and productivity"). The record reflects that this room, described by his job coach as being a "locked" room, was Plaintiff's last chance. If he was unable to perform satisfactorily at this job assignment, he would be fired. Third, Plaintiff received help from a job coach and from his supervisors to be able to do the job. For instance, his supervisors wrote a list for him that broke down his tasks in fifteen-minute intervals. And, after being employed for nine months, Plaintiff still needed supervision 21% of the time. The month before, he was described as needing supervision 34 to 66% of the time. Mr. Sheet, with Challenge Unlimited, wrote that Plaintiff had been granted such special considerations as special supervision, fewer or easier duties, lower quality and production, and lower efficiency. See **Lewis v. Apfel**, 236 F.3d 503, 516-17 (9th Cir. 2001) (finding that Commissioner had failed to show that claimant had engaged in substantial gainful activity when claimant had needed constant supervision and had been criticized for job performance). Fourth, and most importantly, Plaintiff continued to need the services of a job coach. The coach, Ms. Clark, was providing job coaching from March to December 2008 an average of 52% each month. Each of the three agencies involved in Plaintiff's employment – Division of Vocational Rehabilitation, The Center for Head Injury Services, and Community Rehabilitation Services – stated that he needed a job coach to maintain that employment. Additionally, Ms. Yn wrote in May 2011 that Plaintiff would have difficulty maintaining employment without the job coaching support he had been receiving since December 2008.

The ALJ discounted the job coaching services based on Plaintiff's testimony in September 2009 that the job coach came to see him "once in a blue moon." (R. at 116.) Plaintiff further testified that the job coach came to see him ten times during the period from January to December 2008 and five to six times during the period from January to September 2009. The records reflect, however, that the job coach saw him 52% of the time he was at work for the first nine months in 2008. The reliability of Plaintiff's testimony is further weakened by Plaintiff's own contradictory statements. For instance, he testified at the July 2011 hearing that the job coach visits him once a week and then later testified that she visits him once a month. He first testified that he could not do the job without a coach and then later testified that he could do the job without her.

Plaintiff's mother explained that Plaintiff said or did things in order not to displease people. She also testified the job coach visited Plaintiff four to six hours a week to help him stay on task. The ALJ did not question the credibility of Plaintiff's mother's testimony.

In addition to the foregoing evidence describing the special circumstances under which Plaintiff was able to maintain employment, Dr. Belchick, a vocational expert, testified Plaintiff's job was "very definitely an accommodated job." (R. at 80.)

## Conclusion

Plaintiff got a job through a special employment service for disabled people, went to and from the job because of transportation arrangements made for him, and was able to maintain that job because his tasks were limited to one, isolated room and because he was given extra supervision and the help of a job coach. The ALJ's decision that this job is

substantial gainful activity sufficient to terminate the five-step sequential evaluation process at step one is not supported by substantial evidence on the record as a whole.  <u>See</u> **<u>Wiese v. Astrue</u>**, 552 F.3d 728, 730 (8th Cir. 2009).  The decision should be reversed and the case remanded for consideration of steps two through five of the Commissioner's sequential evaluation process.  Accordingly,

     **IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as discussed above.

     The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

<u>/s/ Thomas C. Mummert, III</u>
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  <u>27th</u>  day of November, 2013.